UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80534-CIV-ZLOCH

In re: PETITION OF CAPTAIN WILLIAM
BECK and SEA TOW SERVICES OF THE
PALM BEACHES, INC. d/b/a SEA TOW
PALM BEACH and Certain Vessels, for          **FINAL ORDER OF DISMISSAL**
a License to Engage in Maritime
Salvage on the Coast of Florida,
pursuant to 46 U.S.C. § 80102,

     Petitioners,
and

United States of America

     Intervenor,
_____/

     THIS MATTER is before the Court upon Petitioners' Petition For
A License To Engage In Maritime Salvage On The Coast Of Florida (DE
1). The Court has carefully reviewed said Petition and the entire
Court file and is otherwise fully advised in the premises.

     This action was brought by Petitioners for the issuance of a
license to engage in the business of salvaging on the coast of
Florida, pursuant to 46 U.S.C. § 80102. Section 80102 mandates
that "[t]o be regularly employed in the business of salvaging on
the coast of Florida, a vessel and its master each must have a
license issued by a judge of the district court of the United
States for a judicial district of Florida." 46 U.S.C. § 80102(a)
(2006). The statute goes on to list the criteria a petitioner must
meet before a judge of a United States district court in Florida
may issue such a license to the vessel and its master. These
criteria include whether the "vessel is sea worthy and properly
equipped for the business of saving property shipwrecked and in

distress," and whether "the master is trustworthy and innocent of any fraud related to property shipwrecked or saved on the coast." Id. § 80102(b)(1)-(2).

It is highly unusual, if not unheard of, for a United States district court judge to engage in the survey and inspection of a ship and her captain.   After careful reflection on the various peculiarities of this statute, including the fact that it empowers only the judges of the district courts of Florida alone to act, the Court determined that the instant statute was constitutionally suspect.     Initially,  the  Court  considered  whether  the  statute called upon the undersigned to act in a capacity outside that of a federal judge, as a commissioner.   After determining that the ability of the undersigned to act in the capacity of a commissioner was absent from the statute, the Court turned to the question of whether this action comported with the dictates of Article III. The Court was particularly concerned over whether this ex parte Petition constituted a case or controversy over which the Court may exercise jurisdiction.   Additionally, if the instant Petition was a case or controversy, as contemplated by the use of those terms in Article III, Section 2 of the United States Constitution, the Court considered the question of whether the issuance of a license was an act that exceeded the grant of judicial power given it by Article III, Section 1.

To fully address these constitutionally suspect areas of the statute and the instant Petition, the Court sua sponte ordered briefing from Petitioner.   See DE 2.   Petitioner responded, with great candor, that

2

> [a]s an applicant for a license created by a federal
> statute, which is now required to operate his on-going
> business and the lack of which, effects [sic] his
> livelihood, Petitioner respectfully requests that this
> Court grant the relief sought in his Petition. However,
> and pursuant to this Court's Order, Petitioner must
> candidly submit that 46 U.S.C. § 80102, is
> constitutionally suspect and Petitioner suggests that
> upon review, this Court cannot permissibly exercise its
> judicial power to issue licenses for salvaging on the
> coast of Florida.

DE 3, pp. 9-10. Thereafter, the Court entered an Order (DE 4),
pursuant to Federal Rule of Civil Procedure 5.1 and 28 U.S.C. §
2401, certifying for the United States Attorney General that the
Court had raised a sua sponte challenge to the constitutionality of
46 U.S.C. § 80102. The United States Attorney General (hereinafter
the "Government") then filed a Motion To Intervene (DE 16) in this
matter, which the Court granted. DE 17. In response to the
Court's Order (DE 5), the Government did not analyze the statute's
constitutionality under Article III. Instead, its analysis focused
on the undersigned acting as a commissioner. It argued that the
terms "judge" and "United States District Court" were meant to
identify the actors who performed as commissioners and not meant to
empower the Article III Courts. The Government concluded that §
80102 permissibly empowered the district court judges of Florida to
act as commissioners; however, it reasoned that the issuance of
maritime licenses from judges acting as commissioners impermissibly
trenches upon the prerogatives of the Executive Branch. Therefore,
the Government notified the Court and Congress that it would not
defend the constitutionality of the statute. DE 31.

The Court has carefully reviewed the filings herein and has

3

otherwise considered all possible constitutional constructions of § 80102.  However, for the reasons expressed below, the Court finds that it is without jurisdiction over this action and therefore must deny the instant Petition and dismiss this action.

### I. Background

The practice of "salvaging" is rooted in the maritime cultures of ancient Greece and Rome, where mariners would rescue vessels, persons, and cargo from distress, and as payment for their efforts they would receive a portion of the cargo, or some other pecuniary award if no cargo was rescued.  The particular statute at issue here was passed in its original form when Florida was still a territory.  Act of May 23, 1828, 4 Stat. 291.  It was originally addressed to "wreckers," which was the term then used to describe those who engaged in the practice of salvaging on the coast of the Florida Keys.  Id.; see also William Marvin, A Treatise on the Law of Wreck and Salvage 2 (1858).  Its principal purpose was to combat the problem of nefarious characters who would place lanterns near the reefs, obscuring the ships captains' view of the lighthouses around the Florida Keys, in hopes of drawing merchant ships into the surrounding reefs.  The opportunistic few would then loot the cargo of the shipwrecked vessel.  Id.

In response to this problem, the citizens of Florida, particularly the merchants, petitioned the government to pass a law that would limit the persons who could engage in salvaging to those licensed and designated as so-called "wreckers."  Laws of Florida Territory 2d Session (1828) 128 (n.d.).  If a person engaged in salvaging without the requisite license, he forfeited whatever

4

recovery to which he was otherwise entitled.  Under the new law, those who looted such ships were dealt with harshly.  Marvin, supra, at 3.  The effect of this licensing scheme was to restore order to the shipping channels around the Florida Keys.  Id.

The licensing of "wreckers" was originally administered through the territorial court in the Florida Keys and continued until 1845 when Florida was admitted to the Union.  Soon thereafter, the duties were taken up by the federal judge then sitting in the Florida Keys.  Act of Feb. 23, 1847, ch. 20 § 3, 9 Stat. 131.  Before the statute was passed in 1847, certain members of Congress protested that the power to issue licenses for wrecking was not properly within the judicial power of federal district court judges.

> Mr. Ashley from the Committee on the Judiciary, reported the bill to establish a court at Key West, in the State of Florida, and for other purposes, with amendments.

> . . . .

> Mr. Westcott stated that this was the bill which had come from the House of Representatives. There was a provision in it, introduced by the Committee on the Judiciary, which he thought it was his duty to move to strike out. It had been introduced contrary to his wish, but the committee had overruled his objection. He had doubts whether Congress had the power to vest in the judge of the court the authority given in relation to wrecks. The regulation, he was satisfied, would be beneficial to the State; and the section was copied from an act which was right while Florida was a Territory, and had only delegates on this floor of this House. It gave a ministerial power to a judicial officer; and we might as well give a judge in Arkansas to grant licenses to trade with the Indian tribes, or any other power to carry measures designed by Congress to be vested in ministerial agents.

> He moved to strike out the third section of the bill.

5

Mr. Ashley hoped the section would not be stricken out. The provision in that section was deemed to be within the powers of Congress, and especially applicable to Florida. He hoped no constitutional objection would be raised against it, and if not, that it would be permitted to remain in the bill. The class of persons on whom it was intended to operate required, as much as any body of men, a controlling power over them. In this district of Florida they have more property at their disposal than in any other part of the State. This controlling power had been exercised beneficially heretofore. No one was licensed without previous inquiry, and without satisfactory testimonials of their honesty, their qualifications, and their general good character. The law had been tested, and the business of the wreckers had been regulated and carried on with more propriety and satisfaction than before.

Congressional Globe 391 (Feb. 12, 1847)(emphasis added); In re

William Andrews, 266 F. Supp. 162, 164 (M.D. Fla. 1967) (recounting

a full transcript of the aforementioned debate). Despite the

legitimate concerns of Senator Westcott, the bill passed and

licenses for "wreckers" were subsequently issued by the district

court of Florida.[1] At some point, the statute, 46 U.S.C. § 724,

became largely ignored by mariners who engage in the business of

"salvaging" or "wrecking," with only an occasional petition being

filed over the past century. E.g., In re Marine Archaeological

---

[1] 46 U.S.C. § 724 (2000) read in full: No vessel, or master thereof, shall be regularly employed in the business of wrecking on the coast of Florida without the license of the judge of the district court for the district of Florida; and, before licensing any vessel or master, the judge shall be satisfied that the vessel is seaworthy, and properly and sufficiently fitted and equipped for the business of saving property shipwrecked and in distress; and that the master thereof is trustworthy, and innocent of any fraud or misconduct in relation to any property shipwrecked or saved on the coast.

Ent., Inc., 280 F. Supp. 477 (S.D. Fla. 1968).

In 2006, Title 46 of the United States Code was re-codified by Congress. As part of this re-codification, the statute at 46 U.S.C. § 724 (2000) was amended into its present form with the term salvaging used instead of the term wreckers. It is the current statute that has increased the filings of the petitions for such a license in this District and in the Middle District of Florida.

## II. Undersigned As a Commissioner

In the Government's Response (DE 26) to this Court's Notice Of A Constitutional Challenge and in its Letter to Senator Leahy (DE 37), it notified Congress that it does not intend to defend the statute's constitutionality. In the letter, the Government asserts that the statute does not raise an Article III problem. The Government argues that the statute's use of the term "judge" means that the statute is meant to conscript the district court judges of Florida into acting as commissioners. Thus, as commissioners, the district court judges are freed of the dictates of Article III. In both its Response and its Letter, the Government does not bother to address the issue of how Congress may in a constitutional manner transform a district court judge into a commissioner. It simply asserts that Congress has.

As discussed more fully below, § 80102 does not present the Court with a case or controversy that it may adjudicate. The only way for this statute to be a constitutionally licit is for the

7

Court to act apart from Article III.  Thus, the Government argues that under § 80102 district court judges of Florida are free to act as commissioners.  While it is the duty of courts to construe ambiguous statutes in such a way as to avoid a constitutional challenge, Jones v. United States, 529 U.S. 848, 857 (2000), this duty does not permit a court to simply assert that it is acting as something other than a court of law to save a statute from a constitutional challenge.  Federal judges being conscripted into extra-judicial service is a rare occurrence.  For the Court to act as such, the mandate must come from the clearly expressed intent of Congress evidenced in the statute and be in conformity with the dictates of the Appointments Clause.  U.S. Const. Art. II, § 2, cl. 2.  Thus, it cannot be presumed that the use of the term "judge" alone, without attendant circumstances to suggest such extra-judicial authority, is both proper under the Constitution and contemplated by Congress.

The Government's argument rests on the text of § 80102.  The text is distinct in that it purports to vest a licensing power in the judges of the district courts of Florida, rather than in the courts.  The statute requires anyone who would be "regularly employed in the business of salvaging on the coast of Florida" to obtain "a license issued by a judge of the district court of the United States for a judicial district of Florida."  46 U.S.C. § 80102(a) (2006).  It is noteworthy that Congress would seek to

8

direct petitioners to the judges of the district court, and not to the courts themselves. This stands in stark contrast to other statutes dealing with judicial actions. Cf., F.R.E. 201(d)(noting when "[a] court" shall take judicial notice); 28 U.S.C. § 1332(d)(3)(stating the discretion of a "district court" to decline to exercise jurisdiction); Fed. R. Civ. P. 11(c)(stating the discretion of "the court" to impose sanctions for violations of the Federal Rules of Civil Procedure); 29 U.S.C. § 216(b) (noting the conditions in which "[t]he court" shall award attorney's fees); 5 U.S.C. § 552(a)(4)(A)(vii) (referring to "the court['s]" review of an agency decision de novo); but see 28 U.S.C. § 2254 ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus . . . .")(emphasis added).

There are two notable instances when federal judges have been called upon to act in a non-judicial manner by Congress. In Hayburn's Case, Congress called upon the federal Circuit Courts to "to regulate, among other things, the claims to invalid pensions," of widows of the Revolutionary War. These decisions by the federal Circuit Courts were then subject to review by the Secretary of War. Hayburn's Case, 2 U.S. (2 Dall.) 408, 409 (1792). A number of Supreme Court Justices, writing separately, as federal judges, noted that they could not perform the duties set forth in the act, because it called upon them to act in a non-judicial function; that

is, as a commissioner.  Id. at 409-10.  However, the Justices
writing in Hayburn's Case noted that they could and would happily
act as commissioners in their individual and personal capacities,
but could not perform such duties in their capacity as Article III
judges.  Id.

Then, in 1823 Congress passed an Act to carry into effect the
terms of the 1819 Treaty with Spain, which ceded Florida to the
United States.  The Act called upon the territorial judges and
later the federal judges of Florida to adjust claims arising under
the treaty.  The judges' findings were then sent to the Secretary
of the Treasury who, being satisfied with the decision, paid the
award.  In United States v. Ferreira, the Supreme Court addressed
an appeal of such an award.  Ferreira, 54 U.S. (13 How.) at 47.
The Supreme Court described the judges' duties under the Act as
follows:

> [A]ll that the judge is required to do, is to receive the
> claim when the party presents it, and to adjust it upon
> such evidence as he may have before him, or be able
> himself to obtain. But neither the evidence, nor his
> award, are to be filed in the court in which he presides,
> nor recorded there; but he is required to transmit, both
> the decision and the evidence upon which he decided, to
> the Secretary of the Treasury; and the claim is to be
> paid if the Secretary thinks it just and equitable, but
> not otherwise. It is to be a debt from the United States
> upon the decision of the Secretary, but not upon that of
> the judge.

Id. at 46-47.  Thus, the Court reasoned that

> [t]he authority conferred on the respective judges was
> nothing more than that of a commissioner to adjust
> certain claims against the United States; and the office

10

> of judges, and their respective jurisdictions, are
> referred to in the law, merely as a designation of the
> persons to whom the authority is confided, and the
> territorial limits to which it extends.

Id. at 47.  The Supreme Court declined to rule on the merits of the

appellant's claim, stating it had no jurisdiction to review a non-

judicial decision.  Id. at 47, 50.  In its opinion, the Supreme

Court also declined to address whether the judges acting in the

capacity of commissioners were officers of the United States as

defined in the Appointments Clause.  Id. at 51; U.S. Const. art.

II, § 2, cl. 2.

The issue of whether a federal judge may serve as a

commissioner was again addressed in Mistretta v. United States, 488

U.S. 361 (1989).  In Mistretta, the Supreme Court addressed a

challenge to the United States Sentencing Commission and the

appointment of certain federal judges who sat on the Commission.

There, among other things, the Court determined that the text of

the Constitution and the holdings of Hayburn's Case and Ferreira

permit federal judges, in their individual capacity, to act as

commissioners.   See  Mistretta,  488  U.S.  at  404  ("[T]he

Constitution, at least as a per se matter, does not forbid judges

to wear two hats; it merely forbids them to wear both hats at the

same time.")  As such, the power "judges wield as Commissioners is

not judicial power; it is administrative power derived from the

enabling legislation."  Id.

The Supreme Court went on to qualify its holding on the

propriety of judges engaging in such extra-judicial service.

> This is not to suggest, of course, that every kind of
> extrajudicial service under every circumstance
> necessarily accords with the Constitution. That the
> Constitution does not absolutely prohibit a federal judge
> from assuming extrajudicial duties does not mean that
> every extrajudicial service would be compatible with, or
> appropriate to, continuing service on the bench; nor does
> it mean that Congress may require a federal judge to
> assume extrajudicial duties as long as the judge is
> assigned those duties in an individual, not judicial,
> capacity. The ultimate inquiry remains whether a
> particular extrajudicial assignment undermines the
> integrity of the Judicial Branch.

Id. at 409. The Supreme Court also addressed the voluntary nature

of the judges' service on the Commission, their independent pay as

commissioners, and the propriety of their appointments by the

President, and his ability to remove them from the Commission. See

id. at 405-07, 409.

Turning to the instant statute, if § 80102 is meant to

designate the power to issue licenses for salvaging in district

court judges of Florida as individuals and not as an Article III

judges, then certain attendant conditions must be present to

establish an office outside that of an Article III Court. Actors

in the United States government are separated into three

categories: they are either so-called principal officers, inferior

officers, or mere employees. If the district court judges of

Florida are transformed into commissioners by virtue of § 80102, as

the government asserts they are, then the dispositive issue is into

what category of governmental actors do judges as commissioners

12

fall.  If the judges are principal officers or inferior officers, their position must come by virtue of appointment.  U.S. Const. art. II, § 2, cl. 2.  However, if as commissioners they are "mere employees," then their position does not require any special procedures and may be done in accordance with the established hiring policies of the United States Government.

When courts distinguish between an officer and a mere employee, their inquiry focuses upon the nature of the position held, the power wielded by that person, and the process through which they may be removed.  See Freytag v. Comm'r of Internal Revenue, 501 U.S. 868, 880-81 (1991); Mistretta, 488 U.S. at 404; see also Buckley v. Valeo, 424 U.S. 1, 126 (1976) ("[A]ny appointee exercising significant authority pursuant to the laws of the United States is an Officer of the United States, and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of [Article II].").[2]  Pursuant to § 80102 there is no executive or judicial oversight of a judge's decision whether to grant a license for salvaging.  See Freytag, 501 U.S. at 880-81 (noting the importance of control and final decision making authority in determining whether an official is an inferior officer).  Additionally, a judge's position as a commissioner under § 80102 is concurrent with and exclusive to his position as a federal judge.  Thus, the judges

---

[2]For the purpose of this Order, the Court will not address whether judges acting as commissioners under § 80102 would be considered officers or inferior officers.

would hold this office also "during good behavior," and the only way a commissioner under § 80102 may be removed from his duties as a commissioner is through the impeachment process.   U.S. Const. art. III, § 1; cf. Morrison v. Olson, 487 U.S. 654, (1988).

There is also Supreme Court precedent that addresses the issue of a commissioner's status under the Appointments Clause.  In Go-Bart Importing Co. v. United States, 282 U.S. 344 (1931), the Supreme Court found that commissioners are inferior officers.  Id. 352-53.  This was reaffirmed in Morrison v. Olson.  See 487 U.S. at 673.  Thus, if by operation of § 80102 the district court judges of Florida were to become commissioners, for purposes of the Appointments Clause, their position would appropriately be considered an officer of the United States.

Therefore, as officers, even as inferior officers, the district court judges of Florida would have to be appointed by the "President, the Courts of law, or the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  This statute clearly makes no mention of appointment being made by the President, the Courts of law, or the heads of Departments.  It is well settled that Congress does not enjoy the power of appointment.  Buckley v. Valeo, 424 U.S. at 126; Ferreira, 54 U.S. (13 How.) at 51.  Further, the appointment of an officer must be made through voluntary acceptance. Mistretta, 488 U.S. at 408.  To date, the undersigned has not been made aware of any such en masse nomination or appointment of the

14

district court judges of Florida.   Therefore, the circumstances that attach to the appointment of a district court judge to the position of a commissioner are absent from § 80102.   Thus, there is no basis to conclude that the statute should be read to direct the district court judges of Florida to act in the capacity of commissioners who are officers of the United States.

Because there has not been an Article II appointment, if § 80102 were meant to conscript the district court judges of Florida to act in an extra-judicial capacity and issue licenses for salvaging, it would have to operate as a mere hiring provision to avoid a violation of Article III.   In its Response, the Government asserts that the statute permits the undersigned to act as a commissioner.   However, the undersigned cannot assume such duties, without a basis in law and fact to support the same.   Courts look to a variety of factors to determine whether a federal actor is an officer or a mere employee.   See Freytag, 501 U.S. at 880-81; Buckley, 424 U.S. at 126.   Mere employees have no final decision-making power, they may be removed for any reason, including an official's preference for another employee, and they have no tenure.   See Buckley, 424 U.S. at 126; see also Edmond v. United States, 520 U.S. 651, 663 (1997) (The exercise of "significant authority pursuant to the laws of the United States" marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, . . . the line between officer and

15

nonofficer."); In re Comm'rs of the Circuit Court, 65 Fed. 314, 316
(C.C.W.D.N.C. 1894). As noted above, if Congress intended all
district court judges in Florida to act as mere employees, they
have clothed the same with an inordinate amount of power and
protection from removal. Actors who exercise final decision making
authority, and who may not be removed except through impeachment
are not mere employees. Cf., Id.; Freytag, 501 U.S. at 880-81. It
is impossible to reconcile the attributes of judges who would
purport to serve as commissioners under § 80102 to those of a mere
employee. Therefore, without addressing whether the issuance of
licenses treads upon the prerogatives of the Executive Branch,
there is no basis to maintain, as the Government does, that the
district court judges of Florida may act as commissioners under the
instant statute.

Beyond a pure Appointment Clause analysis, the instant statute
and its attendant conditions are distinguishable from the actions
described supra where federal judges acted or were supposed to act
as commissioners. In both Ferreira and Hayburn's Case, the
judicial officers acting as commissioners did not make a final
determination over the action. Rather, their determinations were
subject to executive review. Hayburn's Case, 2 U.S. (2 Dall.) at
408 (noting review of the Secretary of War); Ferreira, 54 U.S. (13
How.) at 46-47 (noting review by the Secretary of Treasury). In
Ferreira, there was also no record of the judges' decisions kept by

16

the district court.  Although, the facts are unclear as to whether the judges were paid additional sums as commissioners in the aforementioned cases, the Court notes that in <u>Mistretta</u> the Supreme Court made specific mention of the judges' salary as commissioners. <u>Mistretta</u>, 488 U.S. at 411 n.32.

Section 80102 lacks the attendant conditions that pervaded the Supreme Court's decisions that involved federal judges who acted in an extra-judicial capacity as commissioners.  Under § 80102, there is no executive review of a judge's decision to grant a license. There are no standards promulgated by the Coast Guard or any other executive entity to guide a judge's decisions as to whether a captain is of good character and a vessel fit for salvaging. Further, the filings and the records for actions brought under § 80102 are kept in the normal course of the district court clerk's record keeping.  Each petition is given a case number and assigned randomly to a judge in the district.  <u>See</u> Fed. R. Civ. P. 79; S.D. Fla. L.R. 3.4.  Additionally, the undersigned is unaware of any additional and welcomed income for issuance of salvage licenses to which the undersigned and his colleagues would be entitled as commissioners.  <u>Cf.</u>, <u>Mistretta</u>, 488 U.S. at 411 n.32.  Although the undersigned would willingly execute the duties of a commissioner, if properly appointed, out of sheer altruism, it is both unfair and possibly illegal for Congress to require the same from all district court judges in Florida.  5 U.S.C. §§ 5301 <u>et seq.</u> (2006); <u>McCorkle</u>

v. United States, 559 F.2d 1258, 1261 (4th Cir. 1977) ("The Government would be saving nothing and losing much if it did not recognize and follow this principle of equal pay for equal work for Federal employees.").

Therefore, there is no basis to assume that the mere use of the term "judge" in § 80102, without more, has in some way transformed the district court judges of Florida, in the execution of their duties and responsibilities, into commissioners. First, it is impossible to consider their actions taken pursuant to § 80102, to be those of mere federal employees. Likewise, as noted above, there has been no appointment of the district court judges of Florida as officers of the United States. Therefore, it must be assumed that the instant Petition and all petitions under § 80102 are meant to proceed in the normal course of a federal civil action. Thus, the instant Petition will be held to the same standards as all other matters brought before the Court for ajudication.

### III. Case or Controversy

Before the Court may act in any matter, it must first determine whether it has jurisdiction over the cause and parties before it. This Court's exercise of jurisdiction is limited by Article III, Section 2 of the Constitution to "cases" and "controversies" that arise between certain entities and persons. U.S. Const. art. III, § 2. The term "case" has been loosely

defined as a suit "instituted according to the regular course of judicial procedure." <u>Muskrat v. United States</u>, 219 U.S. 346, 356 (1911). The term "controversy" is less comprehensive than the term "cases" and "it includes only suits of a civil nature." <u>Id.</u> (citing <u>Chisholm v. Georgia</u>, 2 U.S. (2 Dall.) 419 (1793)). The preposition "between" found in Article III, Section 2 naturally denotes a relationship among at least two, possibly more, individuals or entities, that, in a legal sense, is adversarial. The seminal treatment for defining the limitations put upon a court's exercise of its judicial power by the terms "cases" and "controversies" was put forth by the Supreme Court in <u>Muskrat v. United States</u>.

> By cases and controversies are intended the claims of litigants brought before the courts for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs. Whenever the claim of a party under the constitution, laws, or treatises of the United States takes such a form that the judicial power is capable of acting upon it, then it has become a case. <u>The term implies the existence of present or possible adverse parties, whose contentions are submitted to the court for adjudication.</u>

<u>Muskrat</u>, 219 U.S. at 356-57 (emphasis added). Thus, for the Court to exercise jurisdiction over a case it must necessarily involve two parties, in pursuit of an honest and actual antagonistic assertion of one party's rights against the other. <u>Chicago & G.T.R. Co. v. Wellman</u>, 143 U.S. 339, 345 (1892); <u>see also</u> <u>United States v. Johnson</u>, 319 U.S. 302, 305 (1943) (noting that "honest

and actual antagonistic assertion of [a] right to be adjudicated .
. . . is indispensable to adjudication of constitutional questions"). This principle applies equally to all cases involving admiralty. Ex parte Easton, 95 U.S. 68, 72 (1877); see also Romero v. Int'l Terminal Operating, Co., 358 U.S. 354, 361 (1959) (noting Article III empowers "Congress to revise and supplement maritime law within the limits of the Constitution").

Where there is such a concrete case that contemplates an immediate and definite determination of the legal rights of the parties in an adversary proceeding, the judicial power may be appropriately exercised. See Osborn v. Bank of United States, 22 U.S. (9 Wheat.) 738, 760-62 (1824); Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239-40 (1937). However, the Court may not act upon a party's petition or complaint that does not present the Court with a "case" or "controversy" upon which its judicial power may extend. See Fed. Radio Comm'n. v. Gen. Elec. Co., 281 U.S. 464, 469-70 (1930). This limitation moors the federal courts to their constitutional mandates and keeps them from drifting into the executive or legislative functions of government. Hayburn's Case, 2 U.S. (2 Dall.) at 410.

Turning to the instant Petition, the paradigm constructed for proceedings under § 80102 falls outside the norms that traditionally govern proceedings before this and every other federal court. A petition for a license under § 80102 is filed ex

20

parte. There is no adversarial party to contest the qualifications
of a petitioner and his salvaging ship under § 80102. Rather, the
Court itself is charged with acting as both the adversary and the
judge.

Thus, the only antagonism in a proceeding under § 80102 is
asserted by the Court against a petitioner's right to a salvaging
license. The posture of a court acting in this manner is well
recognized in administrative proceedings, see, e.g., Richardson v.
Perales, 402 U.S. 389, 409-10 (1971) (approving of inquisitorial
court proceedings used in the administrative proceedings of the
Social Security Administration), where the agency is not
constrained by the dictates of Article III, Section 2 of the
Constitution. See Thomas v. Union Carbide Agr. Products Co., 473
U.S. 568, 583 (1985). While such a dual role of a court is found
in the civil law courts of Continental Europe, commonly referred to
as inquisitorial courts, it is squarely at odds with our common law
adversarial system. See, e.g., Ingram v. Comm'n of Social Sec.
Admin., 496 F.3d 1253, 1269 (11th Cir. August 23, 2007) (noting
that social security courts are inquisitorial, not adversarial in
nature); Christopher J. Peters, Persuasion: A Model of
Majoritarianism as Adjudication, 96 Nw. U. L. Rev. 1, 22 (2001).

The lack of an adversarial party and the Court's posture as an
inquisitorial court precludes this matter from being considered
either a "case" or a "controversy," as those terms are used to

define this Court's limited jurisdiction.  U.S. Const. art. III, §
2.  Thus, because a petition brought pursuant to § 80102 does not
present the Court with a case or controversy to which its judicial
power may extend, the Court does not have jurisdiction over this
action and must dismiss the instant Petition.  <u>Keller v. Potomac
Elec. Power Co.</u>, 261 U.S. 428, 444 (1923) ("[T]he jurisdiction of
this court . . . is limited to cases and controversies in such form
that the judicial power is capable of acting on them and does not
extend to an issue of constitutional law framed by Congress . . .
without real parties on a real case, or to administrative or
legislative issues or controversies.").

In the alternative, if a reviewing court were to find that the
proceedings outlined in § 80102 present a case or controversy such
that a district court of Florida could properly exercise its
jurisdiction in adjudication of the instant Petition, or if a
reviewing court found that the current procedural posture of this
action with the United States as an intervening Party constituted
a case or controversy, the Court would still deny the instant
Petition, because the Court lacks the power to issue licenses.

### IV.   The Vesting Clause

It is well established that laws passed by Congress and duly
signed by the President are presumed constitutional.  It is only in
the rare instance when the dictates of a statute force a court to
act in a manner that is otherwise not authorized by the

22

Constitution that it will decline to act in the manner prescribed by Congress. _Hayburn's Case_, 2 U.S. (2 Dall.) at 410; _Marbury v. Madison_, 5 U.S. (1 Cranch) 137 (1803); _Fed. Radio Comm'n v. Gen. Elec. Co._, 281 U.S. 464, 467 (1930).

It is the governing principle of our republic that our federal government is divided into three distinct and independent branches that abstain from and oppose encroachment on each other. _Hayburn's Case_, 2 U.S. (2 Dall.) at 410; Joseph Story 3 _Commentaries on the Constitution of the United States_ § 1564 (1833). Article III of the United States Constitution states that "[t]he judicial power of the United States shall be vested in one supreme Court and in such inferior Courts as Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. The term "judicial power," as it is used in the Constitution, is defined as the power to hear and determine those matters which affect life, liberty, or property, by declaring for the parties what the law is, and their rights in conformity thereto. _See_ Story, _supra_ §§ 1586-1590; _see also Muskrat_, 219 U.S. at 355 ("Judicial power . . . is the power of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision.") (quotation omitted). With the investiture of the judicial power in the nation's federal courts there is also a natural limitation put upon them: federal courts may only act in a manner that is consistent with judicial action. _Hayburn's Case_, 2

23

U.S. (2 Dall.) at 410; <u>United States v. Ferreira</u>, 54 U.S. (13 How.) 40, 50-51 (1851). This inherent limitation to the Court's power also applies to the other branches of government, as legislative power is vested only in the Congress through Article I, Section 1, and the executive power is vested in the President alone through Article II, Section 1 of the Constitution. Thus, the President may not pass legislation, and Congress may not act in an executive capacity. <u>See, e.g.</u>, <u>Meyers v. United States</u>, 272 U.S. 52 (1926) (discussing the powers of the President); <u>Youngstown Sheet & Tube, Co. v. Sawyer</u>, 343 U.S. 579, 634 (1952) (Jackson, J., concurring) (noting the inherent limitations upon the President's power); <u>INS v. Chadha</u>, 462 U.S. 919 (1983) (discussing limitations upon Congress's power).

Applying the principle of a natural limitation to federal courts' judicial power means that "neither the legislative nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner." <u>Hayburn's Case</u>, 2 U.S. (2 Dall.) at 410; <u>see also</u> <u>Morrison v. Olson</u>, 487 U.S. 654, 677 (1988) ("As a general rule, we have broadly stated that 'executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution.'") (quoting <u>Buckley v. Valeo</u>, 424 U.S. 1, 123 (1976)). Since Congress cannot delegate to the courts power that is beyond what has been vested in them by the

Constitution, the actions of the judiciary must remain consistent with the manner and function of actions contemplated in a judicial act. See Keller, 261 U.S. at 444; see also Muskrat, 219 U.S. at 355 ("The power conferred on [the judiciary] is exclusively judicial and it cannot be required or authorized to exercise any other [power].").

The Founding Fathers' views on the separation of powers, as memorialized in the Federalist Papers, contemplated a natural overlap of each branch's essential power in the exercise of the other branches' duties. The Federalist No. 47, at 325-26 (James Madison)(J. Cooke ed. 1961). Thus, courts may be clothed with executive, legislative, and quite often administrative powers that are incidental to the exercise of the judicial power and necessary for the effective governance of the courts' proceedings. See, e.g., United States v. Mistretta, 488 U.S. 361, 388-91 (1989). This use of power is upheld as constitutional when it does not tread upon the prerogatives of another Branch, and where said functions are appropriate under the central mission of the judiciary. See, e.g., Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 20-21 (1825); Sibbach v. Wilson & Co., 312 U.S. 1 (1941) (upholding the power of the court to promulgate the Federal Rules of Civil Procedure). Thus, the doctrine of separation of powers contemplates or simply tolerates a natural overlap as a matter of practical and essential expediency. Mistretta, 488 U.S. at 385-88;

25

<u>Chandler v. Judicial Council of the Tenth Circuit of the United States</u>, 398 U.S. 74, 86 n.7 (1970).

The problem arises when a non-adjudicatory function that a court is charged to perform is not simply incidental to the judicial action, but is the very nature of the act that Congress has called upon the judiciary to perform. <u>See, e.g.</u>, <u>Hayburn's Case</u>, 2 U.S. (2 Dall.) at 409-10; <u>Ferreira</u>, 54 U.S. (13 How.) at 46-48. In instances when Congress calls upon courts to act in a manner that is not strictly judicial in its essential character and in furtherance of a judicial act, the courts must, out of respect for their proper function and constitutionally limited role in our republic, decline to take such action. <u>Muskrat</u>, 219 U.S. at 355; <u>Keller</u>, 261 U.S. at 444. Often in doing so a reviewing court will declare the relevant statute unconstitutional. <u>See, e.g.</u>, <u>Bordenelli v. United States</u>, 232 F.2d 120, 123 (9th Cir. 1956) (striking down a statute as unconstitutional that gave district courts of Alaska the power to grant liquor licenses).

In the instant action, the crux of the Court's inquiry is whether the power to issue licenses, as directed under 46 U.S.C. § 80102, is a judicial act as contemplated in the Vesting Clause's use of the term "judicial power." U.S. Const. art III, § 1. A license for commercial purposes can be loosely defined as formal permission for someone to engage in an enterprise that is regulated by and may not be engaged in without permission of the applicable

authority. E.g., William Blackstone, 4 Commentaries *158-59 (With
regards to monopolies, they are a "license or privilege allowed by
the king for the sole buying and selling, making, working, or using
of any thing whatsoever; whereby the subject in general is
restrained from the liberty . . . which he had before."); see also
Ala. Power Co. v. Fed. Power Comm'n, 128 F.2d 280, 288-89 (1942)
(noting "[t]he grant of a license, [is] a privilege from the
sovereign"). Thus, only an entity in which the authority to
regulate a particular activity is vested, may issue a license for
said activity. Moreover, the actual issuance of a license is
effectively an administrative or ministerial action. See, e.g.,
Fed. Radio Comm'n, 281 U.S. at 467 (noting that the "granting and
renewal of station licenses [is] purely administrative").

Therefore, the focus of the Court's inquiry is whether the
power to regulate salvaging on the coast of Florida is a power
properly vested in the Judiciary. If it is not, then the Court
must determine whether the power to do so may be delegated to the
Court and whether the exercise of such power in the issuance of a
license is contemplated in its judicial power.

It is indisputable that the power to regulate the nation's
waterways and pass laws circumscribing the commercial navigation
thereof is within the exclusive purview of Congress. See Gibbons
v. Ogden, 22 U.S. (9 Wheat.) 1, 2 (1824). However, from the
beginning of our country, the regulation of the navigable waters,

27

particularly for the purposes of commercial enterprises, has been duly vested in the Executive Branch.  While Congress is free to legislate concerning the conditions and tariffs that attach to commercial navigation, it is the Executive Branch's prerogative to determine whether applicants meet the criteria for licenses for commercial navigation.  Therefore, the power to issue licenses is deposited in the Executive Branch.

Congress has affirmed this point by vesting the power to issue commercial maritime licenses in the United States Coast Guard, upon the proper inspection of ships and their captains.[3]  46 U.S.C. § 7101 (2006) (the power to issue licenses and certificates); §§ 3301-3309 (the inspection of sea faring ships); §§ 8301-8304 (the testing of captains).  Thus, the power to issue licenses is executive and not properly vested in the federal courts. Therefore, it may not be exercised by a federal court unless it is in furtherance of a judicial act, such as in the case of a bar license.  Ex parte Garland, 71 U.S. (4 Wall.) 333, 378-79 (1866).

As noted above, the Vesting Clause of Article III authorizes federal courts to act only in a manner consistent with the judicial power.  Federal courts do not posses any power to act other than the judicial power.  See Gordon v. United States, 117 U.S. 697, 700

---

[3]The Court notes that the United States Coast Guard is in the Department of Homeland Security, the Secretary of which sits in the President's cabinet.  Thus, the United States Coast Guard is an executive actor.  See 46 U.S.C. § 7101 (2006).

(1864) ("The power conferred on this court is exclusively judicial, and it cannot be required to exercise any other."). However, courts are permitted to take action that is incidental to and essential to carrying out the judicial act of adjudication. Wayman, 23 U.S. (10 Wheat.) at 20-21. Actions that courts have tolerated as licit exercises of executive, legislative, administrative, or ministerial power stand in stark contrast to the act of issuing licenses under § 80102, which Congress has called upon the district courts of Florida to perform. See Ex parte Garland, 71 U.S. (4 Wall.) at 378-79. ("[Attorneys'] admission or their exclusion from [to the bar of a court] is not the exercise of a mere ministerial power. It is the exercise of judicial power . . . .").

The issuance of licenses for salvaging off the coast of Florida is not an action taken in furtherance of carrying out a judicial act or part of the Court's governance of the proceedings before it. Wayman, 23 U.S. (10 Wheat.) at 20-21; see also Ex parte Garland, 71 U.S. (4 Wall.) at 378 ("The order of admission [to the bar] is the judgment of the court that the parties posses the requisite qualifications as attorneys and counselors and are entitled to appear as such and conduct causes therein."). Rather, the sole purpose of § 80102 is the issuance of licenses for commercial salvaging off the coast of Florida. The fact that this is a solitary executive action akin to an administrative proceeding

removes it from any permissible infringement upon the separation of powers that may have otherwise been tolerated by the Judiciary in the past.    Thus, the Court finds that Congress's purported delegation of authority upon the district courts of Florida to issue licenses under § 80102 would extend this Court's exercise of power beyond the "judicial power" granted to it in the Vesting Clause of Article III.  Therefore, if it were later determined that the instant action constitutes a case or controversy, the Court is nevertheless powerless to act pursuant to § 80102 and issue a license to Petitioner for salvaging on the coast of Florida.

The Court notes that Petitioner is engaged in the business of salvaging and that he seeks to comply with the governing law by having the Court issue a license, as prescribed by § 80102, for him to lawfully engage in the same.   The Court recognizes that the instant Petition does not present the Court with a case or controversy upon which it may exercise jurisdiction, and that its analysis of § 80102 effectively prevents Petitioner from engaging in his chosen trade, while his competitors have had licenses issued by the district courts of Florida.  In his Response (DE 3) to this Court's Order on briefing and in several subsequent filings Petitioner urges this Court to strike this statute down as unconstitutional.  <u>See</u> DE 33.  However, because the Court does not have subject matter jurisdiction over this action, it may not exercise its judicial power to do so.  Therefore, the Court looks

to Congress's speedy repeal of this constitutionally infirm statute.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. That Petitioner William Beck's Petition For A License To Engage In Maritime Salvage On The Coast Of Florida (DE 1) be and the same is hereby **DENIED** for the reasons expressed in this Order;

2. That the above-styled cause be and the same is hereby **DISMISSED** for lack of jurisdiction over the same; and

3. To the extent not otherwise disposed of herein all pending Motions are **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this _6 th_ day of December, 2007.

WILLIAM J. ZLOCH
United States District Judge

Copies Furnished:

Michael B. Mukasey, Esq.,
United States Attorney General

R. Alexander Acosta, Esq.,
United States Attorney for
the Southern District of Florida

Michael John McHale, Esq.,
For Petitioner

31